1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

JAMES OSKAR HILDINGER,

                    Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 13-CV-1370-W (WVG)

**REPORT AND
RECOMMENDATION:**

**GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT (DOC. NO. 14.)**

**DENYING DEFENDANT'S
CROSS-MOTION FOR
SUMMARY JUDGMENT (DOC.
NO. 17)**

17

18

19

20

21

      On June 12, 2013, Plaintiff James Oskar Hildinger ("Plaintiff"), filed a Complaint against Carolyn W. Colvin, Acting Commissioner of Social Security, ("Defendant"), appealing the decision of an Administrative Law Judge ("ALJ") of the San Diego Office of Disability Adjudication and Review ("ODAR"), denying him disability insurance benefits.  (Doc. No. 1.)

22

23

24

25

26

27

      On September 16, 2013, Defendant filed an Answer to Plaintiff's Complaint. (Doc. No. 11.)   On November 18, 2013, Plaintiff filed a Motion for Summary Judgment.  (Doc. No. 14.)  On February 3, 2014, Defendant filed a Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment. (Doc. No. 17.)  On March 3, 2014, Plaintiff filed an Opposition to Defendant's Motion for Summary Judgment and Reply to Defendant's Opposition.  (Doc. No. 19.)

28

13CV1370

1   The Court, having reviewed Plaintiffs' Complaint, Defendant's Answer,

2   Plaintiff's Motion for Summary Judgment, Defendant's Cross-Motion for Summary

3   Judgment and Opposition to Plaintiff's Motion for Summary Judgment, Plaintiff's

4   Opposition to Defendant's Motion for Summary Judgment and Reply to Defendant's

5   Opposition, and the Administrative Record ("Tr.") filed by Defendant, hereby

6   RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED,

7   Defendant's Cross-Motion for Summary Judgment be DENIED, and the case be

8   remanded for further proceedings.

9   ## I. SUMMARY OF APPLICABLE LAW

10   The Social Security Act, 42 U.S.C. § 401, et seq. ("the Act"), under which the

11   Social Security Administration ("SSA") provides benefits to certain disabled

12   individuals, creates a system by which the SSA determines who is entitled to benefits,

13   and by which unsuccessful claimants may seek review of adverse determinations.

14   Defendant, as Commissioner of the SSA, is statutorily responsible for the administra-

15   tion of the Act.

16   ### A. SSA'S FIVE-STEP SEQUENTIAL PROCESS

17   Defendant administers several types of benefits under the Act, including

18   benefits based on disability. The SSA utilizes a five-step sequential evaluation codified

19   by SSA 20 C.F.R. § § 416.920, 404.1520, to determine whether a claimant is eligible

20   for benefits. To qualify for disability benefits under the Act, a claimant must show that

21   he or she suffers from a medically determinable impairment that can be expected to

22   result in death, or that has lasted or can be expected to last for a continuous period of

23   twelve months or more, and the impairment renders the claimant incapable of

24   performing the work that he or she previously performed, or any other substantially

25   gainful employment that exists in the national economy. See 42 U.S.C. § §

26   423(d)(1)(A), (2)(A); 1382(c)(3)(A). A claimant must meet both requirements to

27   qualify as "disabled" under the Act. Id. The claimant bears the burden of proving that

28   he or she was either permanently disabled or subject to a condition which became so

severe as to create a disability prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

Step one in the five-step sequential evaluation process determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i).  If he is, disability benefits are denied.  20 C.F. R. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments.  That determination is governed by the "severity regulation," which provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  Such abilities and aptitudes include, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" [u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting."  Id.  If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.

Prior to step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  20 C.F.R § 404.1520(e).  An individual's RFC is his ability to do

13CV1370

physical and mental work activities on a sustained basis despite limitations from his impairments. See 20 C.F.R. § 404.1520. To determine the claimant's RFC, the ALJ must assess relevant medical and other evidence and consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(3).

If the claimant's impairment discussed in step three is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, where the ALJ determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 404.1520(f). The term "past relevant work" means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years, or fifteen years prior to the date that disability must be established. In addition, the work must have been substantial gainful activity and have lasted long enough for the claimant to learn to do the job. 20 C.F.R. § § 404.1560(b), 404.1565. If the claimant has the RFC to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is able to do other work, he is not disabled. 20 C.F.R. § 404.1520(g). If the claimant is not able to do other work and meets the duration requirement, he is disabled. 20 C.F.R. § 404.1520(g). Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the SSA. In order to support a finding that an individual is not disabled at this step, the SSA is responsible for providing evidence to demonstrate that other work exists in significant numbers in the national economy that the claimant can perform, given his RFC, age, education, and work experience. 20 C.F.R. 404.1512(f); 404.1560(c).

13CV1370

### B. <u>SSA HEARINGS AND APPEALS PROCESS</u>

Under direct delegation from Defendant, the ODAR administers a nationwide hearings and appeals program.  SSA regulations provide a four-step process for administrative review of a claimant's application for Federal Disability Insurance Benefits ("DIB") and SSI payments.  <u>See</u> <u>generally</u> 20 C.F.R. § § 404.900, <u>et</u> <u>seq.</u>, 416.1400, <u>et</u> <u>seq.</u>  A decision is made at the initial, reconsideration, ALJ, and Appeals Council levels.  <u>Id.</u>  If the claimant is not satisfied with the decision at any step of the process, he has sixty days to seek administrative review.  <u>See</u> 20 C.F.R. 404.907, 404.929, 404.933, 416.1407, 416.1429, 416.1433.  If the claimant does not request review, the decision becomes binding.  <u>See</u> 20 C.F.R. § § 404.905, 416.1405.

Applications for disability benefits are initially processed through a network of SSA field offices and state disability determination services.  The process begins by a claimant completing an application and an adult disability report, and submitting the documents to one of SSA's field offices.  If the claim is denied, the claimant is entitled to a hearing before an ALJ in SSA's ODAR, where the ALJ will review the claim.  20 C.F.R. § 404.929.  The SSA employs ALJs to adjudicate claims under the Act for claimants who are not satisfied with the administrative determination of their case and have requested an administrative hearing.  20 C.F.R. § § 404.933, 416.1429.  Hearings before ALJs are informal and non-adversarial proceedings.  20 C.F.R. § 404.900(b).  The claimant may have an attorney or non-attorney act as his representative at the hearing, or the claimant has the option of representing himself.  20 C.F.R. § 404.900(b).  If the claimant receives an unfavorable decision by an ALJ, he may seek review by the Appeals Council.  20 C.F.R. § 416.1455.

The Appeals Council, also part of ODAR, acts on claimant requests for review of unfavorable decisions issued by ALJs.  The Appeals Council will either grant, deny, or dismiss a claimant's request.  If a claimant disagrees with the decision of the Appeals Council, or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court pursuant to 42 U.S.C. Section 405(g), Section

1383(c); See 20 C.F.R. § § 404.981, 416.1481.  The Appeals Council also has the power to review an ALJ's decision *sua sponte* within sixty days of the decision.  20 C.F.R. § 416.1481.  If a federal district court remands the claim, it will be sent to the Appeals Council, and remanded with instructions to an ALJ for further review.

## II. **PROCEDURAL HISTORY**

On May 13, 2010, Plaintiff filed an application for disability insurance benefits pursuant to the Act.  (Tr. 27.)  In his application, Plaintiff alleged that he became disabled on January 15, 2010.  (Tr. 27.)  On August 25, 2010, the Agency denied Plaintiff's initial application, and on March 10, 2011, the application was denied on reconsideration. (Tr. 27, 38-72, 74-78.)  On April 20, 2011, Plaintiff filed a written request for a hearing before an ALJ.  (Tr. 27.)

On February 22, 2012, Plaintiff, who was represented by counsel, appeared at a hearing before ALJ Edward D. Steinman in San Diego.  (Tr. 27, 33, 42-61.) Plaintiff testified at the hearing, as did vocational expert, Gloria Lasoff.  (Tr. 42-61.)

On February 29, 2012, the ALJ issued a decision, finding that Plaintiff was not disabled at any time between the alleged disability onset date through the date of the decision.  (Tr. 32.)  The ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work, but he should avoid climbing ropes, ladders or scaffolds and also avoid concentrated exposure to wetness, vibration, and even moderate exposure to hazardous materials as defined in 20 C.F.R 404.1567(b).  (Tr. 29.) Further, the ALJ found that Plaintiff was capable of returning to his past relevant work in a managerial position.  (Tr. 32.)  On April 22, 2013, and again on June 18, 2013, the Appeals Council denied review of the ALJ's decision.  (Tr. 1-10.)

## III. **STATEMENT OF FACTS**

### A. **GENERAL BACKGROUND**

Plaintiff was born on September 13, 1957.  (Tr. 130.)  Plaintiff has not been employed since January 15, 2010.  (Tr. 158.)  However, his employment history includes working in various managerial positions dating back to 1998 and as a Sous

Chef from 1992-1998.  (Tr. 159.)  Plaintiff claims he was terminated from his last two positions because he was not "able to perform the job."  (Tr. 57.)  Although he was not yet diagnosed, Plaintiff feels "one-hundred percent" certain that his termination from each position was a result of having Multiple Sclerosis ("MS"),[1] because he previously "had a stellar employment record."  (Tr. 57.)

At the administrative hearing before the ALJ, Plaintiff testified that he did not believe his MS had progressed since January 2010 and that his prescribed medication was "sufficiently controlling any new lesions or new flare-ups."  (Tr. 46.)  Plaintiff indicated that he suffers from fatigue and is "extremely limited" when attempting to do any physical activity.  (Tr. 47.)  He estimated that he can lift and carry five to ten pounds, stand for in between five and ten minutes maximum, and walk in between one and a half to two blocks maximum before needing to rest.  (Tr. 47, 48.)  He indicated that he has "no problem" sitting because it "relieves the fatigue."  (Tr. 47-48.)  Plaintiff also estimated that in an eight-hour workday, he could stand for a total of thirty minutes and work "maybe two hours a day."  (Tr. 49.)

Plaintiff also testified that he suffers from vertigo intermittently and short-term memory loss.  (Tr. 50, 51.)  He indicated that repetition and making lists aid in reducing his short-term memory loss.  (Tr. 51, 52.)  Additionally, Plaintiff injects himself every Tuesday with prescribed medication for his MS.  (Tr. 52.)  Plaintiff claims that the day after the injection, he is at half of his strength due to his body's reaction to the medication.  (Tr. 52.)  In response to the ALJ's inquiry about whether Plaintiff could take the medication on the weekend, Plaintiff stated that he would have to disrupt his

---

[1] "Multiple sclerosis is an unpredictable, often disabling disease of the central nervous system that disrupts the flow of information within the brain, and between the brain and body."  Common symptoms include fatigue, walking difficulties, numbness or tingling, spasticity, and vision problems.  National Multiple Sclerosis Society website: http://www.nationalmssociety.org/What-is-MS and http://www.nationalmssociety.org/Symptoms-Diagnosis/MS-Symptoms.

13CV1370

injection schedule because his doctor recommended that the medication be taken at the same time every week.  (Tr. 52.)

Plaintiff testified that he spends about ten hours each day resting on the couch with his legs elevated at a ninety-degree angle to help alleviate fatigue.  (Tr. 54.) Plaintiff stated that he developed this method of resting, not his doctor.  (Tr. 54.) Plaintiff also testified that he drives two to three times each week to go to the grocery store and run errands.  (Tr. 55.)  Plaintiff stated that the only other activity he does on a regular basis is some gardening for about two hours each week.  (Tr. 55.)

Ms. Gloria Lasoff, a Vocational Expert, also testified at the administrative hearing.  (Tr. 58-60.)   Ms. Lasoff classified Plaintiff's previous employment in managerial positions as sedentary and light work.  (Tr. 59.)   The ALJ posed a hypothetical question to Ms. Lasoff regarding the type of positions that were available for an individual with Multiple Sclerosis, diabetes, left-shoulder strain, who is limited to carrying twenty pounds occasionally, ten pounds frequently, sitting, standing, and walking up to six hours in an eight-hour work day, frequently pushing and pulling with his left upper extremity and reaching with his left upper extremity above the shoulder, but should avoid climbing ropes, ladders, or scaffolds, as well as concentrated exposure to wetness, vibrations, and even moderate exposure to hazardous materials.  (Tr. 58-59.)  The ALJ asked Ms. Lasoff whether the hypothetical would permit Plaintiff to perform any of his prior work.  (Tr. 59.)  Ms. Lasoff responded that Plaintiff could return to his past relevant work in a managerial position.  (Tr. 59.)

The ALJ posed a second hypothetical to Ms. Lasoff based on Dr. Jody Corey-Bloom's February 2012 assessment wherein Dr. Corey-Bloom indicated that Plaintiff had MS, frequent fatigue, could stand and walk less than two hours, sit for four hours, needs to elevate his legs at ninety degrees, can rarely lift and carry ten pounds or less, can use his upper extremity five to ten percent of the time during an eight-hour work day, and would likely be absent from work more than four days each month.  (Tr. 59-60.)  The ALJ stated that he assumed that the limitations alluded to in Dr. Corey-

13CV1370

Bloom's assessment would prevent an individual from working, and Ms. Lasoff indicated that the ALJ's assumption was correct.  (Tr.  60.)

In his final hypothetical, the ALJ noted that Plaintiff indicated that he is not able to sustain work.  (Tr.  60.)   The ALJ again stated that he assumed based on Plaintiff's assessment, that Plaintiff could not work, and Ms. Lasoff again indicated that the ALJ's assumption was correct.  (Tr.  60.)

### B. MEDICAL HISTORY

#### 1. Treatment With Twin Peaks Medical Imaging

On January 23, 2009, Plaintiff had spine and brain MRIs conducted at Twin Peaks Medical Imaging.  (Tr. 255-58.)  "Moderately severe" lesions were found in Plaintiff's brain MRI that were suggestive of MS.  (Tr. 258.)  The findings of both MRIs in conjunction were also found to be suggestive of MS.  (Tr. 255.)  On October 7, 2009, Plaintiff underwent another brain MRI.  (Tr. 253-54.)  Two of the lesions from the previous brain MRI were no longer evident, the remainder of the lesions appeared stable, and there were no new lesions.  (Tr. 253-54.)

#### 2. Treatment With Rocky Mountain Family Practice

On July 6, 2009, Plaintiff was seen by his neurologist who treated him for MS.  (Tr. 273.)  Plaintiff admitted to "extreme fatigue," no change in vision, and his vitals were stable.  (Tr. 273.)  On October 5, 2009, Plaintiff's neurologist noted that he was planning to start Plaintiff on "steroids in the next few days due to lower extremity weakness." (Tr. 271.)  On October 13, 2009, Dr. Matthew Ehrlich evaluated Plaintiff's vision and found that Plaintiff's eyes showed no manifestations of MS.  (Tr. 298.)  Progress notes from January 6, 2010, indicate that Plaintiff was "severely limited due to his MS" and that he did "stretching exercises regularly due to left-sided weakness due to his MS."  (Tr. 270.)

#### 3. Treatment With Colorado Institute For Neuro-Muscular Disease

On January 21, 2009, Dr. Richard Popwell performed a consult of Plaintiff for Dr. Michael Larimore.  (Tr. 309-11.)  Plaintiff's chief complaints were weakness and

balance problems.  (Tr. 309.)  During the consult, Plaintiff recalled "developing a limp on his right side about three years ago."  (Tr. 309.)  Although surgery was not considered necessary at the time the limp developed, Plaintiff stated that "he gradually began to appreciate additional symptoms."  (Tr. 309.)  The additional symptoms included difficulty in getting his left leg out of his car, loss of feeling in his left hand, bilateral leg weakness, and numbness.  (Tr. 309.)  Prior to the consult, Plaintiff had begun chiropractic therapy, but had "not experienced improvement in his symptoms." (Tr. 309.)  Plaintiff also complained that he suffered from extreme fatigue.  (Tr. 309.) Dr. Popwell recommended a brain and spine MRI, with additional diagnostics to be based on the MRI findings.  (Tr. 311.)

On January 28, 2009, Plaintiff returned to Dr. Popwell's office to review his MRI results.  (Tr. 320.)  Plaintiff stated that his symptoms were unchanged and that there were no new symptoms.  (Tr. 320.)  Dr. Popwell indicated that as a result of Plaintiff's MRI findings, "MS [was] highly suspect." (Tr. 320.)  Dr. Popwell also noted that Plaintiff suffered from fatigue that was "likely directly related to [MS]." (Tr. 320.)

On February 16, 2009, Plaintiff again visited Dr. Popwell to review recent lab tests.  (Tr. 318.)  Plaintiff reported "some mild dizziness when leaning over" and blurry vision.  (Tr. 318.)  Plainitff also admitted "to dryness in his mouth, urinary frequency, and constipation."  (Tr. 318.)  Plaintiff's fatigue persisted as did his numbness and weakness.  (Tr. 318.)  Dr. Popwell diagnosed Plaintiff with Relapsing-Remitting Multiple Sclerosis.[2/]  (Tr. 318.)

---

[2/] "Most people who have been diagnosed with MS have a type called relapsing-remitting MS (RRMS)."  One who has RRMS may have attacks when symptoms flare up that are called relapses.  "A relapse is followed by recovery or remission of symptoms.  A remission can last weeks, months, or even longer...The disease is stable during this time – meaning it [does not] progress."  WebMD website: http://www.webmd.com/multiple-sclerosis/guide/relapsing-remitting-multiple-sclerosis.

13CV1370

On April 6, 2009, Plaintiff visited Dr. Popwell and reported continued fatigue. (Tr. 316.) Plaintiff also stated that he "noticed some blurring of vision," with both eyes being affected. (Tr. 316.)

On October 5, 2009, Plaintiff reported to Dr. Popwell for a follow-up and stated that his fatigue persisted and that he had noticed slowing in his thought process. (Tr. 315.) Plaintiff indicated that he was having "some mild word selection problems and, sometimes, even slurring of words." (Tr. 315.) Plaintiff informed Dr. Popwell that he attempted to walk on a daily basis, but noticed fatigue and mild disequilibrium when he did so. (Tr. 315.) Plaintiff further informed Dr. Popwell that his symptoms of left-sided weakness and bowel and bladder dysfunction had returned. (Tr. 315.) Dr. Popwell noted that "[r]elapse with associated exam findings...poses risk for significant disability. Timing unknown." (Tr. 315.)

On October 28, 2009, Plaintiff again visited Dr. Popwell and indicated that "his weakness, fatigue and bladder dysfunction persist." (Tr. 314.) Dr. Popwell noted that Plaintiff's MS was "[s]table per imaging despite recent clinical issues." (Tr. 314.)

On January 6, 2010, Plaintiff reported to Dr. Popwell that his strength had improved, however, his fatigue remained quite problematic, especially after walking or standing for ten minutes. (Tr. 312.) Additionally, Plaintiff reported continued bladder problems and poor hand coordination. Dr. Popwell again noted that Plaintiff's MS was "[s]table per imaging despite recent clinical issues." (Tr. 312.)

#### 4. **Treatment With Sharp Rees-Stealy Medical Center**

On August 11, 2010, and recently after moving to San Diego from Colorado, Plaintiff met with Dr. Scott Riedler to establish care regarding his MS. (Tr. 347.) Plaintiff reported to Dr. Reidler that he was diagnosed with MS and diabetes in 2009 and that he suffers from bladder and bowel incontinence, coordination, balance and motor control issues, reduced strength in his legs, fatigue, and cognitive function issues. (Tr. 347.) Plaintiff also informed Dr. Riedler that he has had a lot of physical therapy, but the therapy has not helped improve his condition. (Tr. 347.) Dr. Riedler noted that

13CV1370

"there is a bit of a bounce to [Plaintiff's] step when he walks consistent with mild spasticity." (Tr. 349.)  Dr. Riedler found Plaintiff's history and MRI findings to be "very consistent" with MS.  (Tr. 349.)

On September 9, 2010, Plaintiff met with Dr. Alan Chang to establish care for his diabetes.  (Tr. 350.)  Plaintiff indicated that he was currently doing well with his MS, but he was concerned about managing it.  (Tr. 350.)  Plaintiff also did not have any complaints of fevers, chills, nausea, vomiting, shortness of breath or chest pain.  (Tr. 350.)  Dr. Chang noted that Plaintiff appeared to be doing well and that he would "follow [Plaintiff] for his diabetes."  (Tr. 352.)

On September 22, 2010, Plaintiff met with Dr. Riedler for neurocognitive testing. (Tr. 354.) Dr. Riedler noted that Plaintiff did "satisfactorily on neurocognitive testing."  (Tr. 355.)  Dr. Riedler also noted that there was no sign of poor memory, despite Plaintiff's complaint.  (Tr. 355.)

On December 8, 2010, Plaintiff met with Dr. Chang for a follow-up regarding his diabetes.  (Tr. 362-65.)  Dr. Chang noted that Plaintiff was "doing very well with extremely well-controlled type 2 diabetes."  (Tr. 365.)  Dr. Chang also noted that Plaintiff had "stable MS" and was "doing well with his current medical management." (Tr. 365.)

On March 2, 2011, Plaintiff visited Dr. Change for a follow-up regarding his diabetes. (Tr. 401-04.) Plaintiff indicated that he was feeling fine and did not have any complaints of fevers, chills, nausea, vomiting, shortness of breath or chest pain.  (Tr. 401.)  Dr. Chang noted that Plaintiff was "doing well with his type 2 diabetes" and his MS "appear[ed] to be stable."  (Tr. 403-04.)

### 5. Treatment With Neighborhood Healtcare

In July 2011 through November 2011, Plaintiff visited Drs. Kekoa Ede and Bhakti Tantod at Neighborhood Healthcare a total of four times.  (Tr. 407-11, 422-25.) At each visit, Plaintiff was treated for his MS and diabetes, and he was continued on medication for each.  (Tr. 407-08, 410-11, 422-25.)

### 6. Treatment With UCSD Medical Center

An October 12, 2011 record from UCSD Medical Center compares a brain MRI of Plaintiff completed on October 8, 2011, with a brain MRI of Plaintiff completed on October 7, 2009. (Tr. 430.) The record indicates that there were "no new lesions, no change in size, or morphology of lesions." (Tr. 430.) Another record compares Plaintiff's spine MRIs completed on the same dates as the brain MRIs. The record indicates that there were "no new lesions." (Tr. 433.)

On February 10, 2012, Dr. Jody Corey-Bloom completed a MS RFC Questionnaire. (Tr. 443-47.) Dr. Corey-Bloom indicated that Plaintiff was diagnosed with MS in 2006 based on an MRI, and she began treating him on September 22, 2011. (Tr. 443.) She gave him a "fair" prognosis. (Tr. 443.) Dr. Corey-Bloom identified Plaintiff's symptoms, which included: fatigue, balance problems, poor coordination, weakness, unstable walking, numbness, tingling, increased muscle tension, spasticity, bladder and bowel problems, difficulty remembering, depression, difficulty solving problems, and problems with judgment. (Tr. 443.)

Dr. Corey-Bloom opined that Plaintiff was not a malingerer, he had a spastic gait, and that he had the kind of fatigue typical of MS patients. (Tr. 444.) Dr. Corey-Bloom stated that Plaintiff frequently[3] experienced pain, fatigue, or other symptoms severe enough to interfere with his attention and concentration. (Tr. 444.) Dr. Corey-Bloom indicated that Plaintiff was "[c]apable of low stress jobs" and that his "impairments lasted or can...be expected to last at least twelve months." (Tr. 445.)

Dr. Corey-Bloom further opined that Plaintiff could walk two city blocks without needing to rest, sit for two hours at one time before needing to get up, and stand for ten minutes at one time before needing to sit down or walk around. (Tr. 445.) In addition, Dr. Corey-Bloom indicated that Plaintiff could stand and walk less than two

---

[3] The MS RFC Questionnaire defined "frequently" as "34%-66% of an eight-hour working day."

13CV1370

hours in an eight-hour workday, while he could sit for about four hours in an eight-hour workday.  (Tr. 445.)  Dr. Corey-Bloom felt that Plaintiff would need a job that permits shifting positions at will, and that he would need to take a ten minute break every hour during an eight-hour workday.  (Tr. 446.)  Dr. Corey-Bloom also stated that Plaintiff's legs would need to be elevated at a ninety-degree angle for half of an eight-hour workday if he had a sedentary job.  (Tr. 446.)

When assessing how many pounds Plaintiff could lift and carry in a competitive work situation, Dr. Corey-Bloom indicated that Plaintiff could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift and carry twenty pounds or more.[4/]  (Tr. 446.)  Dr. Corey-Bloom also opined that Plaintiff could rarely twist, stoop, or crouch, and never climb ladders or stairs.  (Tr. 446.)  Dr. Corey-Bloom indicated that Plaintiff had significant limitations in doing repetitive reaching, handling or fingering.

Dr. Corey-Bloom noted that Plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, and humidity, while he should avoid even moderate exposure to fumes, odors, dusts, gases, hazardous machinery, and heights.  (Tr. 447.)  Lastly, Dr. Corey-Bloom indicated that Plaintiff would likely be absent from work for more than four days each month as a result of his impairments.  (Tr. 447.)

### 7. Non-Examining Physician Dr. Vu

On August 20, 2010, State agency physician, Dr. Vu, completed a RFC Assessment.  (Tr. 321-25.)  Dr. Vu indicated Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds.  (Tr. 322.)  Dr. Vu also stated that Plaintiff could stand, walk, and sit for about six hours in an eight-hour workday, but he was limited in his upper extremities to push and pull.  (Tr. 322.)  In addition, Dr.

---

[4/] The MS RFC Questionnaire defined "rarely" as "1%-5% of an eight-hour workday"; "occasionally" as "6%-33% of an eight-hour workday"; and "frequently" as "34%-66% of an eight-hour working day."

13CV1370

Vu indicated that Plaintiff could occasionally climb stairs, stoop, kneel, crouch, and crawl, but Plaintiff could never climb ladders.  (Tr. 323.)

Regarding Plaintiff's manipulative limitations, Dr. Vu opined that Plaintiff was limited in above shoulder reaching, while he was unlimited in handling, fingering, and feeling.  (Tr. 323.)  Dr. Vu also opined that Plaintiff had no visual or communicative limitations.  (Tr. 323.)  Dr. Vu indicated that Plaintiff should avoid even moderate exposure to hazards, including machinery and heights, and avoid concentrated exposure to wetness and vibration.  (Tr. 324.)  Also, Dr. Vu stated that Plaintiff had no limitations with regard to extreme cold and heat, humidity, noise, fumes, odors, dusts, and gases.  (Tr. 324.)  Lastly, Dr. Vu noted that a treating or examining source statement regarding Plaintiff's physical capacities was not in the file. (Tr. 325.)

Also on August 20, 2010, Dr. Vu completed a Case Analysis with regard to Plaintiff's impairments.  (Tr. 326-27.)  Dr. Vu indicated that the light RFC would accommodate for MS with steady gait with mild spasticity as well as shoulder strain. (Tr. 327.)  Dr. Vu stated that the "[a]llegations are deemed partially credible and supported for causality by [the medical record] but fully disabling severity is not establish by objective findings.  There are no material inconsistencies noted in [the medical record]."  (Tr. 327.)

### 8. Non-Examining Physician Dr. Pham

On January 27, 2011, non-examining State agency physician, Dr. Pham, completed a Case Analysis with regard to Plaintiff's impairments.  (Tr. 378-80.)  Dr. Pham reviewed Plaintiff's medical records after receiving additional medical records that were not available to Dr. Vu.  Dr. Pham indicated that the additional medical records did "not appear to change" the initial denial decision and that it "appeared approp[riate]" to affirm the prior decision.  (Tr. 380.)

13CV1370

# IV. ALJ'S FINDINGS[5/]

The ALJ made the following pertinent findings:

**1. The [Plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2015.**

**2. The [Plaintiff] has not engaged in substantial gainful activity since January 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).**

**3. The [Plaintiff] has the following severe impairments: multiple sclerosis, diabetes mellitus, hypertension, and left shoulder strain (20 CFR 404.1520(c)).**

**4. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 4040.1525 and 404.1526).**

No physician has opined that the [Plaintiff's] condition meets or equals any listing, and the state agency physicians have opined that it does not.

**5. After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform the full range of light work. The [Plaintiff] could lift and carry twenty pounds occasionally and ten pounds frequently. The [Plaintiff] could stand and walk six hours of an eight-hour workday and sit six hours of an eight-hour workday. The [Plaintiff] could frequently push and pull with his left upper extremity but he should avoid climbing ropes, ladders, or scaffolds. The [Plaintiff] could frequently reach with his left upper extremity above shoulder level. The [Plaintiff] should avoid concentrated exposure to wetness, vibration and even moderate exposure to hazardous materials as defined in 20 CFR 404.1567(a).**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the [Plaintiff's] symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce the [Plaintiff's] pain or other symptoms.

---

[5/] The ALJ's findings are found at Tr. 29-32.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the [Plaintiff's] pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The [Plaintiff] has a history of diabetes mellitus. On December 8, 2010, progress records from Sharp Rees Stealy Medical Center reported the claimant's A1-C level was less than 6%. The [Plaintiff's] type-2 diabetes was well controlled on Januvia and metformin medications. The [Plaintiff] was told to stay on his current medication. The [Plaintiff] was asked to be seen on a follow-up examination in three months (Exhibit 10F/25).

On March 2, 2011, progress records from Sharp Rees Stealy Medical Center reported the [Plaintiff] continued to undergo treatments for diabetes mellitus. The [Plaintiff] said he was feeling fine. The [Plaintiff] had no complaints of fevers, or chills, nausea, vomiting, shortness of breath or chest pain (Exhibit 15F/4).

The [Plaintiff] has a history of multiple sclerosis. The [Plaintiff] has been seeing a neurologist and an urologist. From September 9, 2010 through December 8, 2010, progress records from Sharp Rees Stealy Medical Center reported the [Plaintiff's] multiple sclerosis was stable. The [Plaintiff] was doing well on his current medical management program. The [Plaintiff] saw a neurologist who prescribed amantadine medication for the [Plaintiff] to take daily. The [Plaintiff] has no complaints of side effects from his medications. The [Plaintiff] was doing well and was asked to be seen in three months (Exhibit 10F/25).

On March 2, 2011, progress records from Sharp Rees Stealy Medical Center reported the [Plaintiff] continued to undergo treatments for multiple sclerosis. The [Plaintiff] was taking only one medication for multiple sclerosis. The [Plaintiff] said he was feeling fine. The [Plaintiff] had no complaints of fevers, or chills, nausea, vomiting, shortness of breath or chest pain (Exhibit 15F/4).

On February 10, 2012, Corey Bloom M.D., from UCSD Medical Center completed a Multiple Sclerosis Residual Functional Capacity Question-naire and reported the [Plaintiff] has a history of multiple sclerosis. Dr. Bloom said the [Plaintiff] has been undergoing treatments since September 22, 2011. Dr. Bloom said the [Plaintiff] has symptoms of fatigue, balance problems, weakness, unstable walking, bladder problems, increased muscle tension and many more problems. Dr. Bloom gave the [Plaintiff] a fair prognosis. Dr. Bloom said the [Plaintiff] would be capable of low stress jobs. He also said the [Plaintiff's] impairments would last twelve months. He said the [Plaintiff] could lift and carry ten pounds occasionally and ten pounds rarely. Dr. Bloom said the [Plaintiff] could twist, stoop and crouch rarely and never climb ladders or stairs. He

13CV1370

said the [Plaintiff] could sit two hours and stand ten hours[6/] before needing to sit down. He said the [Plaintiff] could stand and walk less than two hours of an eight-hour workday and sit four hours of an eight-hour workday. Dr. Bloom said the [Plaintiff] should avoid concentrated exposure to extreme cold, heat, wetness, and humidity. The [Plaintiff] should also avoid exposure to fumes, odors, dust, hazardous machinery and heights. Dr. Bloom said the [Plaintiff] would need to take unscheduled breaks. Dr. Bloom gave limitations, which show the claimant is unable to sustain full time work (Exhibit 18).

The undersigned has considered Dr. Bloom's medical opinion that the [Plaintiff's] multiple sclerosis would prevent the [Plaintiff from sustaining] full time work. However, treatment records dated October 12, 2011, from UCSD Medical Center reported a comparison of the results from a brain MRI dated October 7, 2009 and October 8, 2011 showed no change in size of the [Plaintiff's] brain. There was no new lesions and no change in morphology seen (Exhibit 17F). The undersigned finds it appears that Dr. Bloom [sic] assessment merely restated the limitations indicated to him by the [Plaintiff]. Therefore, the undersigned rejects Dr. Bloom's assessment.

...

On December 30, 2010, a third party questionnaire was completed by the [Plaintiff's] spouse Terri L. Hildinger who reported she has been married to the [Plaintiff] for twenty years. Ms. Hildinger reported the two of the[m] do everything together every day. She said the [Plaintiff] eats [breakfast], [takes a break], attempt[s] to do physical therapy, eat[s] lunch and he help[s] her with housework and he help[s] prepare supper. She said the [Plaintiff] need[s] assitan[ce] getting dressed but he has no problems with the rest of his personal care except to remind him to shower and shave and to take his medication. The [Plaintiff] is able to prepare his own meals. The [Plaintiff] is able to shop in stores, pay bills, count change and handle a checkbook and a savings account. The [Plaintiff] read[s] for pleasure and he spends time socializing with his family (Exhibit 8E).

Ms. Hildinger, the [Plaintiff's] spouse did not establish that the [Plaintiff] is disabled. Since she is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the intensity of unusual moods or mannerisms, the accuracy of her report is questionable. Consequently, the undersigned has given greater weight to the treating physicians at Sharp Rees Stealy, UCSD records and from the Neighborhood Health facility (Exhibits 10F, 15F and 17F) who are familiar with the Commissioner's regulations for evaluating disability. Moreover, significant weight cannot be given to the

---

[6/] The record reflects that Dr. Corey-Bloom's response to the question regarding how long Plaintiff could stand at one time was ten minutes, rather than ten hours. (Tr. 445.)

[Plaintiff's] son[7] because like the [Plaintiff's] report and testimony, it is not consistent with the preponderance of the opinions and observations by medical doctors in this case.

The [Plaintiff] testified that his multiple sclerosis is controlled with medications.

After careful consideration of the evidence, the undersigned finds that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The [Plaintiff's] allegations of significant limitations are not borne out in his description of his daily activities. The [Plaintiff] is able to care for his personal hygiene. The [Plaintiff] could dress and bath himself. The [Plaintiff] helps his spouse with household chores. The [Plaintiff] goes shopping in grocery stores. The [Plaintiff] continued to run errand[s] with his spouse in contrast with his allegations of extreme fatigue and the need to spend most of his day with his feet elevated. The [Plaintiff] also continues to drive a car. Although the [Plaintiff] said he has side effects after giving himself avonex injections, on the contrary to his medical records, the [Plaintiff] could choose another day of the week to give himself [the] avonex injection so it would not interfere with his activities during the day. The undersigned finds there is nothing in the records that indicate the extreme level of fatigue that the [Plaintiff] is claiming he has. The intensity, persistence and functional limitations alleged are not credible when considered pursuant to SSR 96-7p.

The weight of the objective evidence does not support the claims of the [Plaintiff's] disabling limitations to the degree alleged.

**6. The [Plaintiff] is capable of performing past relevant work in a managerial position. This work does not require the performance of work related activities precluded by the [Plaintiff's] residual functional capacity (20 CFR 404.1565).**

Gloria Lasoff, M.S., a vocational expert, testified to her thorough review of the medical records and of the [Plaintiff's] testimony. Ms. Lasoff testified the [Plaintiff] could return to [his] past relevant work in managerial position, DOT No. 169.167-082, sedentary level of exertion, skilled, SVP 8.

In comparing the [Plaintiff's] residual functional capacity with the physical and mental demands of this work, the undersigned finds that the

---

[7] The Court believes the ALJ's reference to Plaintiff's "son" was in error because the record does not indicate that Plaintiff has a son. Additionally, the ALJ addresses only the accuracy of Plaintiff's spouse's report of his condition in this paragraph, not any other family member. As such, the Court believes the ALJ was referencing Plaintiff's spouse here.

13CV1370

[Plaintiff] is able to perform it as actually and generally performed.

**7.   The [Plaintiff] has not been under a disability, as defined in the Social Security Act, from January 15, 2010, through the date of this decision (20 CFR 404.1520(f)).**

## V.   <u>STANDARD OF REVIEW</u>

A District Court may only disturb the Commissioner's final decision "if it is based on legal error or if the fact findings are not supported by substantial evidence." <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1229 (9th Cir. 1987); <u>see</u> <u>Villa v. Heckler</u>, 797 F.2d 794, 796 (9th Cir. 1986).  The Court cannot affirm the Commissioner's final decision simply by isolating a certain amount of supporting evidence. <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1200 (9th Cir. 1990).  Rather, the Court must examine the administrative record as a whole. <u>Id.</u>  Yet, the Commissioner's findings are not subject to reversal because substantial evidence exists in the record to support a different conclusion. <u>See</u>, <u>e.g.</u>, <u>Mullen v. Brown</u>, 800 F.2d 535, 545 (6th Cir. 1986).  "Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion." <u>Matthews v. Shalala</u>, 10 F.3d 678, 679 (9th Cir. 1993).  The Commissioner's decision must be set aside, even if supported by substantial evidence, if improper legal standards were applied in reaching that decision. <u>See</u>, <u>e.g.</u>, <u>Benitez v. Califano</u>, 573 F.2d 653, 655 (9th Cir. 1978).

## VI. <u>DISCUSSION</u>

Plaintiff's Motion for Summary Judgment raises two issues: (1) whether there was substantial evidence to support Defendant's rejection of the treating physician's opinion; and (2) whether Defendant's credibility determination is supported by the evidence.  (Doc. No. 14-1 at 4, 9.)

### A.   <u>THE ALJ DID NOT MEET HIS BURDEN OF ARTICULATING SPECIFIC AND LEGITIMATE REASONS FOR REJECTING DR. COREY-BLOOM'S OPINION</u>

Plaintiff argues that the ALJ adopted the opinions of State agency physicians, Drs. Vu and Pham, without expressly stating, but did not articulate legally sufficient

13CV1370

reasons for rejecting the opinion of his treating physician, Dr. Corey-Bloom. (Doc. No. 14-1 at 5.)

Defendant argues that the ALJ provided good reasons that are supported by substantial evidence for rejecting Dr. Bloom's opinion. (Doc. No. 17-1 at 4.) Additionally, Defendant argues that substantial evidence in the record supports the ALJ's RFC finding. Id. at 5.

### 1. **Applicable Law**

The opinions of treating physicians are generally entitled greater weight than the opinions of examining and non-examining physicians. See 20 C.F.R. § 404.1502; see also Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). The ALJ may reject the treating physician's opinion in favor of another physician's opinion if the evidence in the record supports the alternative conclusion. See Orn, 495 F.3d at 632. When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate" reasons for discounting the treating doctor's opinion. Dominguez v. Colvin, 927 F.Supp.2d 846, 858 (9th Cir. 2013) (citing Orn, 495 F.3d at 632). The ALJ may discredit a treating physician's opinion if it is inconsistent with other substantial evidence in the record or is not well-supported by medically accepted clinical and laboratory diagnostic techniques. Orn, 495 F.3d at 631-32.

The ALJ may satisfy the requirement of providing specific and legitimate reasons by "setting out a detailed and thorough summary of facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The ALJ must not only offer his own conclusions, he must also explain why his interpretations are correct. Orn, 495 F.3d at 631 (citing Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).

13CV1370

## 2. <u>Discussion</u>

In determining Plaintiff's RFC for light work, the Court finds that the ALJ failed to provide specific and legitimate reasons for rejecting Plaintiff's treating physician's opinions.  Upon review of the record as a whole, the Court does not find that there is substantial evidence to support the ALJ's reason.  <u>Gonzalez</u>, 914 F.2d at 1200.

The only reason the ALJ provided for rejecting Dr. Corey-Bloom's opinion is that the ALJ believed she "merely restated the limitations indicated to [her] by Plaintiff." (Tr. 31.)  However, the only similarities in the record of Dr. Corey-Bloom's assessment and Plaintiff's self-described limitations are Plaintiff's need to elevate his legs at a ninety-degree angle, how much weight he can lift and carry, how long he can stand at one time, and how far he can walk before needing to rest.  (Tr. 47, 48, 54, 445, 446.)  The only support the ALJ offered for his conclusion is a report from UCSD Medical Center that compares two brain MRI results from October 7, 2009 and October 8, 2011, which notes there was no change in the size of Plaintiff's brain, no new lesions, and no change in morphology.  (Tr. 31.)  Although this report may be true, the Court finds that this alone is not a specific and legitimate reason to reject Dr. Corey-Bloom's opinion.  Since there were very few similarities between Dr. Corey-Bloom's five page assessment and Plaintiff's self-described symptoms, the ALJ was required by Ninth Circuit case law to explain why his interpretations were correct, and he failed to do so here.  <u>See</u> <u>Orn</u>, 495 F.3d at 631.

In addition, the Court finds that there is substantial evidence in the record to support Dr. Corey-Bloom's opinion.  On the MS RFC Questionnaire, Dr. Corey-Bloom identified a number of symptoms Plaintiff suffered from, including: fatigue, balance problems, poor coordination, weakness, unstable walking, numbness, increased muscle tension, spasticity, bladder and bowel problems, difficulty remembering, depression, difficulty solving problems, and problems with judgment.  (Tr. 443.)  The majority of these same symptoms are present throughout the medical record.  Since 2009, the oldest treatment date in the medical record provided, Plaintiff's symptoms have included lower

extremity weakness, extreme fatigue, having to walk with a limp, balance problems, loss of feeling in his left hand, numbness, left foot drop, bladder dysfunction, slowing of his thought process, mild word selection problems, occasional slurring of words, mild disequilibrium, dizziness, blurry vision, and memory problems. (Tr. 270, 271, 273, 298, 309, 311, 312, 314, 315, 316, 318, 347, 359, 360, 410.) Thus, the evidence in the record did not support the ALJ's alternative conclusion.

Moreover, portions of the medical evidence from 2010 and 2011 suggest that Plaintiff was "doing well" on his medication and his condition appeared "stable." (Tr. 365, 403-04.) Plaintiff does not dispute these reports, and even testified that he did not "believe that the disease has progressed." (Tr. 46.) However, a "stable" condition does not automatically suggest that Plaintiff is capable of engaging in competitive work within the context of the SSA. The term "stable" could be interpreted to mean either that Plaintiff's "condition has been good" or that it "has not changed, and [Plaintiff] could be stable at a low functional level." Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir. 2008). The ALJ interpreted the  medical evidence and Plaintiff's testimony to mean that Plaintiff's condition was "good." The ALJ then erroneously applied his interpretation in finding that Plaintiff was capable of engaging in competitive work. Again, the ALJ failed to properly explain why his interpretation of the record was correct.

The Court also agrees with Plaintiff that the ALJ implicitly adopted the findings of the non-examining State agency physicians, Drs. Vu and Pham, as evidenced by the ALJ assigning Plaintiff the same RFC as Dr. Vu. (Tr. 29, 321-25.) As provided in the both the ALJ's and Dr. Vu's RFCs, Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (Tr. 29, 322.) In addition, the ALJ's and Dr. Vu's RFCs state that Plaintiff can stand, walk, and sit six hours in an eight-hour workday. (Tr. 29, 322.) On the other hand, Dr. Corey-Bloom opined that Plaintiff could occasionally lift less than ten pounds and rarely lift ten pounds, while being able to stand and walk for less than two hours in an eight-hour workday, and sit for about four hours in an eight-hour workday. (Tr. 445.) Notably, Dr. Corey-Bloom's assessment was completed about

eighteen months after Dr. Vu's assessment, and about thirteen months after Dr. Pham's assessment.   Thus, neither Dr. Vu nor Dr. Pham analyzed Dr. Corey-Bloom's assessment.

Despite the difference in opinion between Plaintiff's treating physician and the non-examining State agency physicians, the ALJ rejected Dr. Corey-Bloom's opinion solely because the ALJ believed Dr. Corey-Bloom was only restating the limitations described to her by Plaintiff.  By implicitly adopting the findings of Drs. Vu and Pham, the ALJ committed the same infraction he accuses Dr. Corey-Bloom of having committed.  Since he adopted the findings of Drs. Vu and Pham, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Corey-Bloom's opinion, which he did not.  The Court finds that the ALJ failed to do so because he provided only a single, conclusory reason for rejecting her opinion, while he also failed to explain why he instead adopted the assessments of Drs. Vu and Pham.

Therefore, the Court finds that the ALJ failed to articulate specific and legitimate reasons for rejecting Dr. Corey-Bloom's opinion.  The Court recommends Plaintiff's Motion for Summary Judgment on this issue be GRANTED, and the ALJ, upon remand, be required to reconsider Dr. Corey-Bloom's assessment.

### B. THE ALJ FAILED TO ARTICULATE CLEAR AND CONVINCING REASONS FOR FINDING PLAINTIFF'S SUBJECTIVE SYMPTOM TESTIMONY NOT CREDIBLE

Plaintiff argues that the ALJ failed to articulate legally sufficient reasons for rejecting his testimony.  (Doc. No. 14-1 at 12.)  Specifically, Plaintiff argues that his ability to perform daily activities is not determinative of disability, the ALJ did not provide specific findings to discount Plaintiff's testimony regarding the side effects of his medication, and several reports of fatigue in the record discount the ALJ's finding that nothing in the record indicates the extreme level of fatigue Plaintiff alleges.  Id.

Defendant argues that Plaintiff's claims are without merit because substantial evidence supports the reasons the ALJ cited when finding Plaintiff not fully credible. (Doc. No. 17-1 at 7.)

13CV1370

### 1. Applicable Law

Congress expressly prohibits granting disability benefits based on subjective complaints.  42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 404.1529(a) (An ALJ will consider claimant's statements about pain or other symptoms but they will not alone establish disability.)  An ALJ cannot be required to believe every allegation of disability, or else disability benefits would be available for the taking, which would be contrary to the Act.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

In determining the credibility of a Plaintiff's testimony regarding subjective pain, the Ninth Circuit has established a two-step analysis for the ALJ.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "First, the ALJ must determine whether the [Plaintiff] has presented objective medical evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged." Vasquez, 575 F.3d at 591.  Second, if the plaintiff meets the first step and there is no evidence of malingering, the ALJ can only reject the plaintiff's testimony only if the ALJ provides "specific, clear and convincing reasons."  Id.

"In order for the ALJ to find [the Plaintiff's] testimony unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)).  "[T]he [ALJ] may not discredit [the Plaintiff's] testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence."  Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991)  An ALJ may consider a variety of credibility factors, including ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; the claimant's daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain or

13CV1370

other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of any medication; treatment, other than medication; functional restrictions; and unexplained, or inadequately explained, failure to seek treatment or to follow a prescribed course of treatment. Id.; Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see Orn v. Astrue, 495 F.3d 625, 637-39 (9th Cir. 2007). If the ALJ's finding is supported by substantial evidence, it is not the court's role to second guess it. Thomas, 278 F.3d at 959; Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

## 2. Discussion

Here, the ALJ found that "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 32.) However, the ALJ found Plaintiff's testimony not credible concerning the intensity, persistence and limiting effects of his symptoms because they were inconsistent with the residual functional capacity assessment. (Tr. 32.) Since Plaintiff met the first step, the only remaining issue is whether the ALJ provided specific, clear and convincing reasons for discrediting Plaintiff's testimony. Vasquez, 572 F.3d at 591.

The ALJ set forth the following reasons for finding Plaintiff's testimony not credible:

> The [Plaintiff's] allegations of significant limitations are not borne out in his description of his daily activities. The [Plaintiff] is able to care for his personal hygiene. The [Plaintiff] could dress and bath[e] himself. The [Plaintiff] helps his spouse with household chores. The [Plaintiff] goes shopping in grocery stores. The [Plaintiff] continued to run errand[s] with his spouse in contrast with his allegations of extreme fatigue and the need to spend most of his day with his feet elevated. The [Plaintiff] also continues to drive a car. Although the [Plaintiff] said he has side effects after giving himself avonex injections, on the contrary to his medical records, the [Plaintiff] could choose another day of the week to give himself [the] avonex injection so it would not interfere with his activities during the day. The undersigned finds there is nothing in the records that indicate the extreme level of fatigue that the [Plaintiff] is claiming he has. The intensity, persistence and functional limitations alleged are not credible when considered pursuant to SSR 96-7p.
>
> The weight of the objective evidence does not support the claims of the [Plaintiff's] disabling limitations to the degree alleged.

(Tr. 32.)

13CV1370

The Court finds that the ALJ's rejection of Plaintiff's complaints based on his daily activities is not supported by substantial evidence. The ALJ appears to rely only on portions of both Plaintiff's testimony at the hearing and the Adult Function Report completed by Plaintiff in making his determination about Plaintiff's credibility.  In Plaintiff's Adult Function Report, Plaintiff stated that his wife needs to remind him to care for his personal hygiene. (Tr. 188.) Moreover, Plaintiff noted in his Adult Function Report that he helps with household chores <u>once or twice</u> each week, runs errands and goes grocery shopping <u>two times</u> each week, that he does not go anywhere on a regular basis, and he testified at the hearing that he drives <u>two to three</u> times each week.  (Tr. 54, 188-89)(emphasis added).  There is no evidence in the record that Plaintiff performs any of the activities sited by the ALJ daily.  Moreover, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 594 (9th Cir. 2004).

More importantly, however, in order to discredit Plaintiff's complaints based on evidence of daily activities, the ALJ must find that Plaintiff is able to spend a substantial part of the day engaged in pursuits that involve physical functions that are transferable to a work setting.  <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1201 (9th Cir. 1990)<u>; see also</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) (concluding that adverse credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace").  Furthermore, "reading [and] watching television . . . are activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace." <u>Orn</u>, 495 F.3d at 639.  Here, Plaintiff testified that he spends ten hours each day resting and watching television.  (Tr. 54, 55-56.)  The ALJ attempted to discredit this testimony by referencing activities that Plaintiff does not engage in on a daily basis. Even though it appears that the ALJ incorrectly found that Plaintiff engaged in the aforementioned activities on a daily basis, the ALJ failed to discuss how any of those activities could be transferred to the workplace.  There is neither evidence to support that Plaintiff's

13CV1370

activities are "transferable" to a work setting nor proof that Plaintiff spends a "substantial" part of his day engaged in transferable skills.  The Court finds that this reason is not valid to support the ALJ's adverse credibility determination.

Next, the ALJ asserts that Plaintiff "could choose another day of the week to week" to inject his medication "so it would not interfere with his activities during the day." (Tr. 32.)  Although it may be possible for Plaintiff to administer the injection on a different day of the week, there is no evidence in the record that demonstrates how the fatigue Plaintiff states he suffers on a regular basis would decrease, or how it would increase the amount of activities Plaintiff would be capable of engaging in.  Plaintiff testified that he is at half strength the day after the injection due to the medication.  (Tr. 52)(emphasis added).  Plaintiff has not alleged that the fatigue he suffers on a daily basis is a result of the medication.  This reason is also not valid to support the ALJ's adverse credibility finding.

Lastly, the ALJ found that the objective evidence in the record does not support Plaintiff's limitations to the degree alleged. (Tr. 32.)  However, the ALJ did not provide any objective medical findings to support this contention.  See Rollins, 261 F.3d at 857 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.") To the contrary, the medical records contain numerous notes of Plaintiff's fatigue being "significant," "extreme," a "major problem," and "likely directly related to" his MS. (Tr. 273, 309, 311, 312, 315, 316, 347, 424, 443.)  This reason is not valid to support the ALJ's adverse credibility finding.

In sum, the Court finds that the ALJ's listed reasons do not sufficiently address why Plaintiff's testimony regarding his impairment is not credible.   The Court recommends Plaintiff's motion for summary judgment on this issue be GRANTED, and the ALJ, upon remand, be required to reconsider Plaintiff's credibility.

13CV1370

1

### VII. CONCLUSION

2

For the reasons set forth herein, it is recommended that Plaintiff's Motion for

3

Summary Judgment be GRANTED.   Further, this Court RECOMMENDS that

4

Defendant's Cross-Motion for Summary Judgment be DENIED, and the case should be

5

remanded for further proceedings.  This Report and Recommendation will be submitted

6

to the United States District Judge assigned to this case, pursuant to the provisions of 28

7

U.S.C. § 636(b)(1)(1988) and Federal Rule of Civil Procedure 72(b).

8

IT IS ORDERED that no later than May 21, 2014, any party to this action may

9

file written objections with the Court and serve a copy on all parties.  The document

10

shall be captioned "Objections to Report and Recommendation."

11

IT IS FURTHER ORDERED that any reply to the objections shall be filed with

12

the Court and served on all parties no later than June 4, 2014.  The parties are advised

13

that failure to file objections within the specified time may waive the right to raise those

14

objections on appeal of the Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

15

1991).

16

IT IS SO ORDERED.

17

DATED: May 7, 2014

18

19

20

Hon. William V. Gallo
U.S. Magistrate Judge

21

22

23

24

25

26

27

28

13CV1370